**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 19, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JEREMY DAVID JOHNSON,

    Defendant - Appellant.

No. 16-4146
(D.C. No. 2:11-CR-00501-DN-PMW-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McHUGH**, and **MORITZ**, Circuit Judges.
_____

    After a jury trial—during which he represented himself—Jeremy Johnson was convicted of eight counts of making a false statement. See 18 U.S.C. § 1014. In this direct appeal, Johnson advances numerous challenges to both his convictions and the resulting 135-month sentence. But Johnson has waived many of these arguments: his opening brief neither identifies where he raised them below nor attempts to establish plain error on appeal. Thus, we decline to address these arguments. And we also decline, based on various other briefing deficiencies, to address several subsidiary arguments Johnson presents in support of his remaining challenges.

_____

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

To the extent that Johnson has adequately briefed any challenges to his convictions, we reject those arguments on the merits. We do the same with most of Johnson's adequately briefed sentencing challenges. But we agree with Johnson that the district court erred in assessing a two-level enhancement based on its finding that Johnson received more than $1 million as a result of his offenses. Accordingly, although we affirm Johnson's convictions, we reverse his sentence and remand for resentencing.

## Background

Johnson's convictions and sentence arise from his role as the former President and sole owner of the now-defunct IWorks, Inc. (IWorks). The facts underlying Johnson's crimes are complex, familiar to the parties, and—for the most part—not particularly relevant to our evaluation of Johnson's arguments on appeal. Accordingly, we provide only a brief overview of those facts here and discuss additional historical and procedural facts below as they pertain to our analysis of the legal issues before us.[1]

Part of IWorks' business plan involved processing credit-card payments for items that customers purchased online. To process those payments, IWorks needed what's known as a "merchant account," App. vol. 38, 9875—"a type of business bank account that allows a business to accept and process debit[-] and credit[-]card transactions," Aplt. Br. 4 n.1. But in 2008, IWorks' ability to maintain a merchant

---

[1] We note that Johnson's opening brief employs the same approach.

account was threatened when it was placed on the Member Alert to Control High Risk (MATCH) list after IWorks incurred more than $3 million in fines arising from excessive chargebacks.

A chargeback occurs when a buyer who used a credit card to make a purchase becomes dissatisfied with the selling merchant's refund or return policy and reverses payment to that merchant through his or her credit card. Such chargebacks will result in fines if a merchant incurs more than 100 of them in a single month, or if at least one percent of the merchant's sales result in chargebacks. After three months of such fines, a merchant will typically find itself on the MATCH list. And placement on the MATCH list will generally result in an inability to acquire a new merchant account, without which a merchant can't process credit-card payments.

Thus, Johnson and other members of the IWorks team devised a strategy: they would set up multiple merchant accounts in names other than Johnson's. So long as no single merchant account's chargebacks exceeded 100 per month or one percent of sales, no fees would be assessed. And so long as no fees were assessed against any one merchant account for more than three months, no accounts would end up on the MATCH list.

In 2009, Wells Fargo Bank (WFB) began processing most of IWorks' credit-card transactions. WFB is a merchant-acquiring bank: it holds merchant accounts, thus enabling merchants to process credit-card transactions. Merchant-acquiring banks work with Independent Sales Organizations (ISOs), who market credit-card-

3

processing accounts to merchants. Here, the ISO that began opening IWorks' new merchant accounts with WFB was an entity called CardFlex.

Eventually, Johnson and his associates completed 281 merchant-account applications with CardFlex's assistance. Some of the new merchant accounts ended up on the MATCH list. When that happened, Johnson and his associates simply abandoned them and moved processing to different accounts. But those abandoned accounts continued to accrue chargebacks. As a result, WFB eventually became suspicious and terminated several accounts after an investigation revealed that those accounts were all associated with Johnson. In the meantime, though, Johnson personally received at least $1,125,000 in profits from IWorks.

As a result of this scheme, in 2010, the Federal Trade Commission (FTC) initiated a civil consumer-fraud complaint against Johnson, IWorks, and various other individuals and entities in the United States District Court for the District of Nevada. And in 2011, the government indicted Johnson and several of his associates in the District of Utah for, among other things, multiple counts of making a false statement for the purpose of influencing a federally insured bank. *See* § 1014. After a joint trial at which Johnson represented himself, the jury found him guilty of making false statements on eight merchant-account applications. The district court ultimately sentenced Johnson to 135 months in prison. Johnson appeals.[2]

---

[2] Although Johnson proceeded pro se below, he is represented by counsel on appeal.

**Analysis**

## I. General Principles of Waiver and Forfeiture

Before turning to the arguments that Johnson presents on appeal, we pause to discuss some general principles of forfeiture and waiver. As we explain more fully below, our application of these general principles to Johnson's specific arguments leads us to decline to address several of those arguments altogether.

First, "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). Thus, when a litigant fails to raise a particular argument below, we typically treat that argument as forfeited. *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011). And when an appellant raises a forfeited argument or issue for the first time on appeal, we will reverse only if the appellant can satisfy our rigorous test for plain error. *See United States v. Kearn*, 863 F.3d 1299, 1305 (10th Cir. 2017), *petition for cert. filed* Dec. 21, 2017 (No. 17-7210); *Richison*, 634 F.3d at 1130 ("It would be wasteful, and an invitation for potential abuse, to permit a second trip to the district court on the basis of any lesser showing."). Critically, this rule applies not only when a litigant raises a completely new argument on appeal, but also "when 'a litigant changes to a new theory on appeal that falls under the same general category as an argument presented at trial.'" *United States v. Nelson*, 868 F.3d 885, 891 & n.4 (10th Cir. 2017) (quoting *Lyons v. Jefferson Bank & Tr.*, 994 F.2d 716, 722 (10th Cir. 1993)).

To avoid having us treat its claims as forfeited, an appellant must, in its opening brief, "cite the precise reference in the record where [each] issue was raised and ruled on" below. 10th Cir. R. 28.2(C)(2). In the absence of such a citation, we may assume the appellant failed to raise the issue below—an assumption that will trigger plain-error review. *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th Cir. 1996) (noting litigants' obligation to identify in opening brief where each issue was raised and ruled on below; declining to "sift through" voluminous record after appellant failed to do so); *United States v. Williamson*, 53 F.3d 1500, 1514 n.7 (10th Cir. 1995) (independently reviewing record to determine whether defendant raised issue below, but warning that "all counsel should understand the potentially serious consequences that could result from noncompliance with the applicable rules of appellate procedure"); *United States v. Barber*, 39 F.3d 285, 287 (10th Cir. 1994) (assuming that defendant didn't object to jury instruction and reviewing instructional challenge for plain error because defendant "fail[ed] to state in his brief whether he raised an objection to the jury instruction and where in the record any objection c[ould] be found").

Moreover, when an appellant fails to affirmatively establish that it preserved a particular issue by raising it below and *also* fails to make a plain-error argument on appeal, we typically treat the issue as waived (rather than merely forfeited) and decline to review the issue at all—for plain error or otherwise. In that instance, we have explained, "the failure to argue for plain error and its application on appeal . . .

6

marks the end of the road for" that argument. *Kearn*, 863 F.3d at 1313 (alteration in original) (quoting *Richison*, 634 F.3d at 1131).

Taken together, these general principles doom several of Johnson's arguments. As we discuss below, Johnson repeatedly either (1) fails to address whether he raised certain arguments below or (2) asserts that he raised arguments below but then provides record citations that don't support those assertions. Thus, we would normally treat his arguments as forfeited and review them only for plain error. *See United States v. Ibarra-Diaz*, 805 F.3d 908, 916 (10th Cir. 2015); *cf. Barber*, 39 F.3d at 287–88. But Johnson also repeatedly fails to argue for plain error. And that failure "marks the end of the road for" any arguments that Johnson fails to establish he raised below.[3] *Kearn*, 863 F.3d at 1313 (quoting *Richison*, 634 F.3d at 1131)).

Moreover, even when Johnson manages to establish that he raised below the arguments he now presents to us on appeal, he fails to adequately develop several of

---

[3] The parties dispute whether Johnson can rely, for purposes of preservation, on objections and arguments that his codefendants raised below. *Compare, e.g.*, *United States v. Irving*, 665 F.3d 1184, 1207 (10th Cir. 2011) ("Insofar as evidentiary issues are concerned, this court has yet to take a position on vicarious objections."), *with Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir. 1984) ("The objections by the co-defendants were clearly not made on behalf of [appellant], and [appellant] cannot now use the objections of his co-defendants to cure his own failure to object."). We need not resolve this disagreement because its result doesn't alter the outcome of this appeal. Instead, we simply assume that Johnson can avoid plain-error review by sufficiently demonstrating that either he *or* at least one of his codefendants raised below each of the arguments that Johnson now advances on appeal. Thus, when we say Johnson fails to demonstrate that he raised a particular argument below, we mean he fails to demonstrate that either he or any of his codefendants did so. Likewise, when we say Johnson advanced certain arguments below, we mean that either Johnson or at least one of his codefendants advanced them.

those arguments in his opening brief. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's opening brief to contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Were Johnson proceeding pro se on appeal, we might be willing to overlook some of these briefing deficiencies. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("If [p]laintiffs were pro se, we would construe their pleadings liberally."). But Johnson is "represented by counsel, and we expect attorneys appearing before this court to state the issues on appeal expressly and clearly, with theories adequately identified and supported with proper argument." *Id.* Accordingly, to the extent Johnson fails to adequately brief several of his arguments on appeal, we decline to address them. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

## II.     Challenges to Johnson's Conviction

### A.     Sufficiency of the Indictment

Johnson first challenges the sufficiency of the indictment. Specifically, he complains that the indictment failed to allege he communicated any false statements to (1) a bank or (2) a third party that subsequently communicated them to a bank.

Johnson maintains that he advanced this argument below. But the only record citation he provides in his opening brief to support this assertion—App. vol. 67, 18141–53—provides no actual support for it. True, this citation establishes that he

8

challenged the sufficiency of the indictment below.[4] But in discussing the sufficiency of the § 1014 charges in particular, he argued only that the indictment failed to allege (1) what the defendants "intended to influence [WFB] to do"; (2) "whether the statements had the tendency to influence any decision by [WFB]"; and (3) "who made each statement at issue." *Id.* at 18146–47. Johnson said nothing about the indictment's failure to allege actual communication to a bank. Accordingly, this citation is insufficient to demonstrate that Johnson raised below the *specific* argument he now presents on appeal. *See Nelson*, 868 F.3d at 891 & n.4.

So too is the citation that Johnson offers in his reply brief. There, he points out for the first time that he "joined in a motion for bill of particulars." Rep. Br. 1 n.1. But this is too little, too late. First, Johnson failed to provide this citation in his opening brief. *See* 10th Cir. R. 28.2(C)(2); *Harolds Stores, Inc.*, 82 F.3d at 1540 n.3 (noting litigants' obligation to identify in opening brief where each issue was raised and ruled on below); *cf. Reedy*, 660 F.3d at 1274 ("[A] party waives issues and arguments raised for the first time in a reply brief." (quoting *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009))).

Second, the motion Johnson identifies didn't raise the *specific* argument he now advances on appeal. The motion did ask, "In what way were [the alleged statements] made to a federally insured bank?" Supp. App. vol. 6, 902. But nowhere

---

[4] The citation Johnson provides is to a motion filed by his codefendant, Scott Leavitt, who was represented by counsel at trial. We assume Johnson can rely on this motion for issue-preservation purposes. *See supra* note 3.

in the motion did Johnson request dismissal of the indictment or allege that a statement isn't "made to" a bank, *id.*, unless it was *received by* a bank. Instead, the motion simply asked the magistrate judge to order the government to provide a bill of particulars. Thus, this naked question—devoid of argument, analysis, or citations to legal authority—was insufficient to preserve below the specific argument that Johnson now advances on appeal. *See Nelson*, 868 F.3d at 891 & n.4.

Accordingly, Johnson forfeited this challenge to the indictment by failing to raise it below. *See Richison*, 634 F.3d at 1128. And although Johnson does at least mention the plain-error test in his opening brief, he does so only in a single-sentence footnote in which he neither articulates all four of the plain-error test's requirements nor makes any meaningful argument that he can satisfy them. *See id.* (listing steps in plain-error inquiry). Accordingly, we find Johnson's challenge to the indictment waived and decline to consider it. *See Kearn*, 863 F.3d at 1313; *United States v. Hardman*, 297 F.3d 1116, 1131 (10th Cir. 2002) ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

### B. Sufficiency of the Evidence

In a related argument, Johnson next asserts that the government presented insufficient evidence to support his § 1014 convictions because the government failed to prove that any of the statements were "communicated to a bank." Aplt. Br. 9. Instead, he maintains, the statements "were communicated (if at all) to . . . CardFlex, and went no further." *Id.* at 11.

10

At the outset, we note that Johnson once again fails to assert that he raised this specific argument in district court. And he makes no plain-error argument on appeal. Moreover, our independent review of the record indicates that Johnson explicitly conceded below that the government wasn't required to prove he or anyone else actually communicated the false statements to a bank: in his motion for new trial, Johnson argued that "[b]ecause the statements were" made to CardFlex rather than to WFB, the government could alternatively obtain a conviction by proving that Johnson "intended [for] or reasonably should have known" the statements "would be transmitted to [WFB]." App. vol. 9, 1961.

Thus, Johnson's "argument on appeal"—i.e., that the government must prove actual communication to a bank—"is a complete reversal from the position" Johnson advanced in his motion for new trial—i.e., that in the absence of actual communication, it's sufficient to show a defendant merely intended or reasonably should have known that the statements would reach a bank. *United States v. LaHue*, 261 F.3d 993, 1013 (10th Cir. 2001). Accordingly, we could treat Johnson's sufficiency argument, which turns on his argument that actual communication to a bank is an essential element of § 1014, as waived and decline to consider it. *See id.* (noting that invited-error doctrine precludes review on appeal of argument when that argument is "directly contradictory" to appellant's position in district court).

Of course, Johnson didn't explicitly argue below that communication to a bank is *not* an element of § 1014. But "[w]hat he did argue" in his motion for new trial nevertheless "directly contradicts his argument on appeal." *United States v. Jereb*,

11

882 F.3d 1325, 1341 (10th Cir. 2018); *cf. id.* at 1336–41 (holding that although defendant didn't explicitly argue below that assault *isn't* an element of every conviction under 18 U.S.C. § 111(a)(1), he nevertheless invited any error in district court's failure to instruct jury on assault as an element by, among other things, requesting instruction that indicated jury "need not find assault in every case"). Nevertheless, because the government doesn't argue that Johnson waived or forfeited his sufficiency argument, we opt to consider its merits.[5] *See United States v. Heckenliable*, 446 F.3d 1048, 1049 n.3 (10th Cir. 2006) ("The [g]overnment, however, does not argue [d]efendant waived his present challenge, and accordingly, has waived the waiver.").

We review Johnson's sufficiency argument de novo, viewing the evidence in the light most favorable to the government. And "[w]e will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (quoting *United States v. Hale*, 762 F.3d 1214, 1222–23 (10th Cir. 2014)). Thus, the first step in our analysis is to determine the essential elements of Johnson's crime: violating § 1014 by making a false statement.

---

[5] Before we do, we pause to note just how little attention Johnson gives this argument in his opening brief. There, he devotes a scant two paragraphs to his discussion of the cases that—according to him—establish that actual communication to a bank is an element § 1014. *Cf.* Fed. R. App. P. 28(a)(8)(A); *Reedy*, 660 F.3d at 1274 ("[W]e expect attorneys appearing before this court to state the issues on appeal expressly and clearly, with theories adequately identified and supported with proper argument.").

In relevant part, § 1014 prohibits "mak[ing] any false statement . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation." And the Supreme Court has stated that to convict a defendant under § 1014, the government must establish only "two propositions: it must demonstrate (1) that the defendant made a 'false statement or report,' . . . and (2) that he did so 'for the purpose of influencing in any way the action of'" a bank. *Williams v. United States*, 458 U.S. 279, 284 (1982) (quoting § 1014). But according to Johnson, "the offense . . . is not completed until the statement is, in fact, communicated *to* a bank." Aplt. Br. 9 (emphasis added). And before a statement can be communicated to a bank, he asserts, the bank must actually receive that statement.

If § 1014 prohibited "mak[ing] any false statement" *to* a federally insured bank "for the purpose of influencing [it] in any way," we might agree. But § 1014 contains no such language. And we must "ordinarily resist reading words or elements into a statute that do not appear on its face." *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012) (quoting *United States v. Sturm*, 673 F.3d 1274, 1279 (10th Cir. 2012)). Nevertheless, despite the fact that such language doesn't "appear on [the] face" of § 1014, *id.*, Johnson suggests we have long recognized that actual communication to—i.e., receipt by—a bank is an element of this offense. In support, Johnson cites *United States v. Jordan*, 890 F.2d 247, 250 (10th Cir. 1989), and *United States v. Zwego*, 657 F.2d 248, 251 (10th Cir. 1981). But neither of these

13

cases indicates that we have read, or should read, an actual-communication requirement into § 1014.

For instance, the defendant in *Jordan* delivered a "fictitious copy of his tax return" to a bank in February 1983—more than five years before his March 8, 1988 indictment for violating § 1014. 890 F.2d at 249. On appeal, he asserted that the five-year statute of limitations therefore barred his prosecution. We rejected this argument, noting that while the defendant delivered an *initial* round of documents to the bank in February 1983, he later delivered a second round of documents, including a fictitious tax return, sometime "on or after March 17, 1983." *Id.* at 250. And because the defendant made "[t]his second delivery" fewer than five years before the government indicted him, we concluded that the statute of limitations didn't bar the defendant's prosecution. *Id.* At best, therefore, *Jordan* establishes that actual communication to a bank is *sufficient* to satisfy § 1014; it doesn't indicate that actual communication is *necessary*, as Johnson suggests.

Neither does our opinion in *Zwego*. True, we said there that "[t]he proper venue for the offense of making false statements to a federally insured bank may be either where the false statements were prepared, executed, or made, or where the offense was *completed upon receipt* of the false information by the bank." 657 F.2d at 251 (emphasis added). But the question of § 1014's essential elements simply wasn't before us in *Zwego*. *See Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions [that] merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to

14

constitute precedents."). Moreover, to the extent we might find *Zwego* instructive, it actually undercuts Johnson's position. At oral argument, Johnson clarified that his analysis turns on § 1014's requirement that an individual must "make[]" a false statement: according to Johnson, a statement is only made once it is received. But in *Zwego*, we said that venue lies "where the false statements were . . . made, *or . . .* upon receipt of the false information by the bank." 657 F.2d at 251 (emphasis added). And by stating these events in the alternative, we necessarily indicated that the former can occur in the absence of the latter.[6]

---

[6] We recognize that Johnson's opposite view finds support in dicta from other circuits. *See, e.g.*, *Reass v. United States*, 99 F.2d 752, 755 (4th Cir. 1938) ("[C]ommunication of the false statements to the corporation constitutes the very essence of the crime. . . . [I]t is only when [the statements] are communicated to the lending bank that the crime takes place."). But so too does the government's. *See, e.g.*, *United States v. Cavallo*, 790 F.3d 1202, 1231 (11th Cir. 2015) ("[T]he [g]overnment does not have to show that the defendant directly presented the document containing the false statement to [a bank]. Instead, the [g]overnment need only prove that the defendant was on 'notice sufficient to create a reasonable expectation that the statement would reach [a bank].'" (quoting *United States v. Greene*, 862 F.2d 1512, 1517 (11th Cir. 1989))). Because we conclude that the plain language of § 1014 unambiguously indicates that actual receipt by a bank isn't an element of the offense, we see no need to parse such nonbinding statements.

Likewise, we recognize that dicta from our own cases might arguably provide some support for Johnson's position. *See, e.g.*, *United States v. Copus*, 110 F.3d 1529, 1534–35 (10th Cir. 1997) ("Under [§ 1014] . . . , the jury must have found [defendant] made a false statement *to a federally insured bank* knowing the statement was false and intending to influence the bank." (emphasis added)); *United States v. Grissom*, 44 F.3d 1507, 1510 (10th Cir. 1995) (listing "ma[king] a false statement *to a bank*" as an element of § 1014 (emphasis added)). But Johnson doesn't cite these cases in his opening brief. Nor does he contest in his reply brief the government's assertion that these cases demonstrate "actual communication of the false statements to a bank is not an element of § 1014." Aplee. Br. 88. Accordingly, Johnson has waived any reliance on this line of cases, and we therefore decline to address them.

15

In any event, even if we assume that a statement must be received in order to be made, that doesn't help Johnson. As discussed above, § 1014 doesn't proscribe making a false statement *to a bank*; it simply proscribes making a false statement. Thus, even if we accept as true Johnson's assertion that a statement must be received in order to be made, his sufficiency argument fails: Johnson doesn't dispute that CardFlex received the false statements.

### C.    Seized and Frozen Funds

Johnson next argues that the district court violated his Sixth Amendment right to counsel when it denied him access to certain assets seized and frozen by the government—assets that Johnson insists he could have used to obtain counsel of choice. Those assets fall into two general categories: (1) assets that were seized from the home of Johnson's parents pursuant to a search warrant the government obtained as part of the criminal case against him (the silver); and (2) assets that were frozen pursuant to a preliminary injunction that the government obtained in the civil action the FTC initiated against Johnson. We address each category in turn. But first, we provide some relevant background information.

In 2010, before the government initiated the criminal case against Johnson, the FTC filed a civil consumer-fraud complaint against IWorks, Johnson, and various other individuals and entities in the United States District Court for the District of Nevada (the Nevada court). The complaint alleged that Johnson and others "deceptively enroll[ed] unwitting consumers into memberships for products or services and then repeatedly charge[d] their credit cards or debit[ed] funds from their checking accounts without

16

consumers' knowledge or authorization." App. vol. 12, 2704. As a result of this complaint (the FTC Action), the Nevada court issued a preliminary injunction freezing Johnson's assets and appointing a receiver. The following year, the government seized the silver from the home of Johnson's parents. The government then provided the silver to the court-appointed receiver in the FTC Action.

### 1. The Silver

One month before trial, Johnson filed a motion asking the district court to release the silver. In that motion, Johnson didn't invoke the Sixth Amendment. Nor did he suggest he would use the silver to retain counsel. Instead, Johnson represented that if the silver was "returned to [him]," he would use it "to pay [for] items and services to assist in his defense in this case *as a pro se defendant*." App. vol. 4, 841 (emphasis added). Specifically, he asserted that he "would put the property towards legal aids, trial exhibits, and other resources for trial." *Id.* The magistrate judge denied Johnson's motion.

On appeal, Johnson argues that "[t]he denial of access to these funds was a clear violation of [his] Sixth Amendment rights."[7] Aplt. Br. 17. But according to the government, Johnson waived this argument by failing to timely object to the magistrate judge's order denying his motion to release the silver. *See* Fed. R. Crim.

---

[7] We question whether Johnson's request for money to fund his pro se defense was sufficient to preserve his argument on appeal that the district court erroneously deprived him of funds to pay for retained counsel. But we need not resolve this issue; even assuming that Johnson's motion sufficiently invoked the Sixth Amendment right to counsel, we conclude—for the reasons discussed in the text—that he nevertheless waived this Sixth Amendment argument on other grounds.

17

P. 59(a) (allowing party to "file objections to" magistrate judge's order "within 14 days"; requiring district court to "consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous"; and warning that "[f]ailure to object in accordance with this rule waives a party's right to review"); Fed. R. Crim. P. 59(a) advisory committee's note to 2005 adoption (explaining that Rule 59(a)'s "waiver provision is intended to establish the requirements for objecting in a district court in order to preserve appellate review of magistrate judges' decisions"); *United States v. Kelley*, 774 F.3d 434, 439 (8th Cir. 2014) (holding that defendant "waived his right to appeal . . . by failing to file objections with the district court, as required by [Rule] 59(a)").

In his reply brief, Johnson advances three responses to the government's waiver argument. First, he points out that the magistrate judge didn't issue a decision until just days before trial began. And he argues he therefore had "insufficient time to object" to that decision. Rep. Br. 5. But even assuming Johnson didn't have time to object to the magistrate judge's order before trial started, he doesn't explain why the start of trial subsequently rendered him unable to object and thereby preserve the issue for appeal. And we see no reason it should have. Thus, we reject this argument.

Second, Johnson asserts that Rule 59(a)'s waiver provision doesn't apply "when a pro se litigant is not informed of the time for objecting and the consequences of failing to object." Rep. Br. 5. But the lone authority he cites to support this argument predates Rule 59(a)'s 2005 enactment. *Compare Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991) ("We join those circuits that have declined to

18

apply the waiver rule to a pro se litigant's failure to object when the [magistrate judge's] order does not apprise the pro se litigant of the consequences of a failure to object to findings and recommendations."), *with Kelley*, 774 F.3d at 439 n.4 (explaining that Rule 59(a)'s "explicit notice[] of waiver" alleviated court's previous "concerns regarding notice" to litigants that failing to object would preclude raising issue on appeal). More importantly, Johnson doesn't actually assert that he wasn't "informed of the time for objecting and the consequences of failing to object." Rep. Br. 5. Thus, we need not resolve whether the exception *Moore* identifies survives the enactment of Rule 59(a)'s express waiver provision; even assuming it does, Johnson fails to demonstrate that he's entitled to invoke that exception here.

Third, Johnson suggests that we should decline to treat this argument as waived because "the 'interests of justice' require review." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005). But even assuming that *Morales-Fernandez*' interests-of-justice exception survives the enactment of Rule 59(a),[8] we would only review Johnson's argument for plain error. *See id.* at 1122 (applying plain-error test where appellant failed to timely object to magistrate judge's findings and recommendations). And because Johnson fails to make a plain-error argument, the interests-of-justice exception offers him no shelter. *Cf. Kearn*, 863 F.3d at 1313 ("Generally, 'the failure to argue for plain error and its application on appeal . . .

---

[8] We decided *Morales-Fernandez* on August 9, 2005. Rule 59(a) didn't take effect until December 1, 2005.

marks the end of the road for an argument for reversal not first presented to the district court.'" (alteration in original) (quoting *Richison*, 634 F.3d at 1131)).

In short, Johnson (1) failed to timely object to the magistrate judge's order; (2) offers no valid explanation for his failure to do so; (3) doesn't assert that the magistrate judge neglected to inform him of the time for objecting or the consequences of failing to object to its order; and (4) doesn't make a plain-error argument on appeal. Accordingly, even assuming that the waiver-rule exceptions we identified in *Moore*, 950 F.2d at 659, and *Morales-Fernandez*, 418 F.3d at 1119, remain viable after Rule 59(a)'s enactment, Johnson fails to demonstrate he can invoke those exceptions to his benefit here. Thus, we treat as waived and decline to consider his argument that denying him access to the silver violated his Sixth Amendment right to counsel.

### 2. The Frozen Assets

For related reasons, we also decline to consider Johnson's argument that the district court violated his Sixth Amendment right to counsel when it denied him access "to funds frozen in" the FTC Action. Aplt. Br. 17; *see also Luis v. United States*, 136 S. Ct. 1083, 1088 (2016) (plurality opinion) ("[T]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."); *id.* at 1096 (Thomas, J., concurring in the judgment).[9] Here, Johnson

---

[9] The Supreme Court decided *Luis* five days after Johnson's jury trial ended. Because we decline to address this issue for the reasons discussed in the text, we need not resolve whether *Luis*—a case involving the seizure of a criminal defendant's

challenges (1) the magistrate judge's failure to "make any assessment of Johnson's [*Luis*] rights," Aplt. Br. 20; and (2) the district court's subsequent rejection of the *Luis* argument that Johnson made in his motion for new trial.

In denying Johnson relief, both the magistrate judge and the district court expressly noted a critical obstacle to Johnson's request: the civil and criminal actions pending against Johnson were proceeding in different jurisdictions. Specifically, the criminal prosecution was proceeding in Utah, while the FTC Action was proceeding in Nevada. Thus, the magistrate judge declined to hold a hearing on this issue, in part because it concluded that it had no "authority or jurisdiction to make determinations about the frozen assets in the [FTC Action]." App. vol. 2, 318. Likewise, the district court noted that the preliminary injunction arising from the FTC Action gave the Nevada court, rather than the district court, "exclusive jurisdiction . . . over the Assets or Documents of the Receivership Defendants." App. vol. 38, 9917 (alteration in original) (quoting App. vol. 12, 2847). And as the government points out, Johnson actually conceded this point below: he initially acknowledged that the district court lacked authority to modify the Nevada court's order freezing his assets in the FTC Action.[10]

---

assets under a criminal forfeiture statute, *see* 136 S. Ct. at 1087–88 (citing 18 U.S.C. § 1345(a)(2))—extends to cases where, as here, a criminal defendant's assets are frozen as part of an independent civil proceeding.

[10] Johnson also implicitly recognized the Nevada court's jurisdiction over the frozen assets when, before trial, he petitioned the Nevada court to release the assets so that he could use them to fund his defense in this criminal case. The Nevada court denied Johnson's motion, and it doesn't appear that Johnson appealed that ruling.

Curiously, despite the emphasis that the magistrate judge, the district court, and the government placed on this critical aspect of the analysis, Johnson fails to even mention this obvious barrier to relief in his opening brief. In fact, he never specifically acknowledges this basis for the district court's rejection of his argument. Instead, he only vaguely asserts in a footnote that "[b]ecause the criminal prosecution was taking place in Utah, it was not the Nevada court's role to affirmatively protect Johnson's Sixth Amendment rights." Aplt. Br. 20 n.8. But Johnson neither cites any authority nor provides any argument establishing that the district court presiding over the criminal prosecution in Utah—rather than the district court presiding over the FTC Action in Nevada—should have or could have (1) conducted a *Luis* hearing and (2) ordered, if appropriate, the release of the frozen funds. Thus, Johnson has waived any argument on this point. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies"); *Hardman*, 297 F.3d at 1131 ("Arguments raised in a perfunctory manner, such as in a footnote, are waived.").

Indeed, given the district court's and magistrate judge's express reliance on this factor in denying him relief, Johnson had an obligation to argue in his opening brief either that (1) the district court had authority to order release of the funds;[11] or

---

[11] Johnson attempts to address this issue in his reply brief, where he suggests for the first time that the "Nevada court [didn't have] exclusive jurisdiction o[ver] the assets." Rep. Br. 9. But arguments advanced for the first time in a reply brief are

(2) even assuming it lacked such authority, the district court nevertheless had an obligation to perform some other act to ensure protection of Johnson's Sixth Amendment right to counsel. *Cf. United States v. Fisher*, 805 F.3d 982, 991 (10th Cir. 2015) ("[T]he 'first task of an appellant is to explain to us *why* the district court's decision was wrong." (emphasis added) (quoting *Nixon v. City & Cty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015))); *Nixon*, 784 F.3d at 1366 (explaining that in order to adequately challenge district court's ruling, appellant's opening brief must address "reasons that were given by the district court" to support that ruling). And his failure to do so waives any argument to that effect. *See Nixon*, 784 F.3d at 1369 (refusing to address appellant's challenge to district court's ruling because "opening brief contain[ed] nary a word to challenge the [district court's] basis" for that ruling). Accordingly, we decline to address whether the district court erred in failing to order the release of the funds or in denying Johnson a new trial on that basis.

---

waived. *See United States v. Beckstead*, 500 F.3d 1154, 1163 (10th Cir. 2007). Moreover, even in his reply brief, Johnson doesn't establish that he advanced before the district court or the magistrate judge the jurisdictional arguments he now presents on appeal. *See* 10th Cir. R. 28.2(C)(2) (requiring briefs to "cite the precise reference in the record where the issue was raised and ruled on"); *Harolds Stores, Inc.*, 82 F.3d at 1540 n.3 (declining to consider appellant's argument where appellant failed to provide record citation in opening brief establishing it raised argument below). Nor does he make a plain-error argument on appeal. Thus, we decline to address the arguments he does present. *See Kearn*, 863 F.3d at 1313 (explaining that failure to make plain-error argument on appeal "marks the end of the road for an argument for reversal not first presented to the district court'" (quoting *Richison*, 634 F.3d at 1131)).

## D. Fifth Amendment Right to be Present

Johnson next argues that the district court violated his Fifth Amendment right to be present at critical stages of the proceedings. Although Johnson ultimately decided to represent himself at trial, he initially had appointed counsel. And according to Johnson, the district court violated his rights under the Fifth Amendment by failing to ensure his presence at two hearings—one in July 2015 and one in September 2015—addressing a potential conflict of interest that arose from appointed counsel's previous representation of an individual named Justin Lund.[12] *See United States v. Beierle*, 810 F.3d 1193, 1198 (10th Cir. 2016) ("For trial proceedings other than the presentation of evidence, the Due Process Clause governs."). We review this argument de novo. *Larson v. Tansy*, 911 F.2d 392, 394 (10th Cir. 1990).

---

[12] In part, Johnson asserts that appointed counsel was, in fact, actually conflicted; according to Johnson, "Lund's interests were materially adverse to [his] in several respects." Aplt. Br. 24. But in alleging an actual conflict, Johnson doesn't appear to be making a separate Sixth Amendment argument; instead, it appears his actual-conflict argument is simply part of his Fifth Amendment right-to-be-present argument. For instance, he asserts that an actual conflict isn't "a prerequisite to showing a constitutional violation." Aplt. Br. 31. But such a showing would be a prerequisite if Johnson were attempting to establish a violation of his Sixth Amendment right to conflict-free counsel, as opposed to a violation of his Fifth Amendment right to be present.

In any event, even if we assumed that Johnson intended to raise a separate Sixth Amendment argument, we would find it waived and decline to address it. Johnson neither cites the applicable legal test for determining whether an actual conflict exists, nor explains how he satisfies it. *See* Fed. R. App. P. 28(a)(8)(A) (requiring argument section of appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant

Under the Fifth Amendment, a criminal defendant has a "right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge.'" *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). "That is, '[t]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" *Beierle*, 810 F.3d at 1198 (alteration in original) (quoting *Gagnon*, 470 U.S. at 526). Thus, "this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder*, 291 U.S. at 106–07).

Here, Johnson cites the Connecticut Supreme Court's decision in *State v. Lopez*, 859 A.2d 898, 902 (Conn. 2004), for the proposition that an "in-chambers inquiry regarding [a] potential conflict of interest [i]s a critical stage of the defendant's prosecution at which the defendant ha[s] a constitutional right to be present." But as the government points out, the *Lopez* court distinguished between cases where a defendant lacks "a fair opportunity to question the sufficiency of the [court's conflict] inquiry or to . . . object[] to [counsel's] representation of the defendant's interests," *id.* at 905, and those in which an "in-chambers conference subsequently is put on the record in open court with the defendant present," *id.* at 905 n.13.

relies"); *Bronson*, 500 F.3d at 1104 (explaining that we routinely decline to address arguments that fail to comply with these requirements).

25

Here, the magistrate judge conducted just such a hearing. In November 2015, Johnson filed a motion to proceed pro se in which he cited the potential Lund conflict. In response, the magistrate judge conducted a hearing on December 3, 2015. There, in Johnson's presence, the magistrate judge recounted its previous discussion with appointed counsel about the potential Lund conflict. And appointed counsel then detailed "the nature of [her] representation" of Lund. App. vol. 41, 10525. At no point during this hearing did Johnson suggest he was in possession of additional information that might change the magistrate judge's conflict analysis. On the contrary, Johnson conceded that if he had been present for the earlier discussion about the Lund conflict, he "probably maybe . . . would have come to the same conclusion" as the magistrate judge. *Id.* at 10552–53. Moreover, at this same hearing, Johnson withdrew his motion to proceed pro se, thereby acquiescing to appointed counsel's continuing representation.

Notably, Johnson can't prevail on this issue unless his absence—even assuming it gave rise to a Fifth Amendment violation—created a "reasonable possibility of prejudice." *See Larson*, 911 F.2d at 396 (quoting *United States v. Fontanez*, 878 F.2d 33, 37 (2d Cir. 1989)) (reviewing error arising from defendant's absence during "critical junctures in his trial" for harmlessness). And the only potential prejudice that Johnson suggests arose from his absence at the conflict hearings was that he lacked an opportunity to share with the magistrate judge certain additional information. But Johnson had an opportunity to share that information with the magistrate judge at the December 3 hearing: there, the magistrate judge

26

encouraged Johnson to "speak freely" and repeatedly asked if Johnson had "anything else" he wanted to discuss. App. vol. 41, 10529, 10558–59.

Accordingly, even if we assume that Johnson had a Fifth Amendment right to attend the conflict hearings, any violation of that right was later rendered harmless beyond a reasonable doubt. Once the magistrate judge conducted the December 3 hearing—a hearing that Johnson attended—no "reasonable possibility of prejudice" from his absence at the earlier hearings remained. *Larson*, 911 F.2d at 396 (quoting *Fontanez*, 878 F.2d at 37). Thus, we decline to reverse on this basis. And for identical reasons, we decline to reverse based on Johnson's assertion that his absence from the conflict hearings violated Federal Rule of Criminal Procedure 43. *See United States v. Gomez*, 67 F.3d 1515, 1528 (10th Cir. 1995) (explaining that constitutional right to be present "is further protected by" Rule 43); *United States v. Oles*, 994 F.2d 1519, 1525 (10th Cir. 1993) (resolving constitutional question and Rule 43 question simultaneously).

In a related argument, Johnson also asserts the district should have conducted an evidentiary hearing to determine whether the magistrate judge directed appointed counsel not to tell Johnson about the potential Lund conflict. But again, even assuming that (1) the district court abused its discretion in refusing to hold such a hearing and (2) the magistrate judge in fact informed appointed counsel not to tell Johnson about the potential conflict, Johnson nevertheless learned of the potential Lund conflict and had an opportunity to address his concerns about it at a hearing. Accordingly, any potential error in failing to conduct an evidentiary hearing on the

27

magistrate judge's alleged (and ultimately unsuccessful) attempt to conceal that potential conflict was also harmless. *Cf. Wyoming v. Livingston*, 443 F.3d 1211, 1225–26 (10th Cir. 2006).

### E.      Allegedly Privileged Emails

Next, Johnson asserts that the district court violated his Sixth Amendment right to counsel by allowing the government to seize allegedly privileged emails. Johnson suggests by implication that he "preserved" this argument: he cites the standard of review that would apply if he had. Aplt. Br. 40. But he neither explicitly asserts that he raised the argument below nor provides a precise citation to the record establishing as much. And he doesn't argue for plain error on appeal. That "marks the end of the road for" this argument.[13] *Kearn*, 863 F.3d at 1313 (quoting *Richison*, 634 F.3d at 1131).

### F.      Evidence of the False Statements' Alleged Immateriality

As discussed above, Johnson was convicted of violating § 1014 by making false statements for the purpose of influencing a federally insured bank. Johnson next

---

[13] The government advances an alternative reason for treating Johnson's email argument as waived: it asserts that (1) Johnson *did* raise this argument below; (2) the magistrate judge rejected it; and (3) Johnson waived appellate review by failing to object to the magistrate judge's ruling. *See* Fed. R. Crim. P. 59(a) (explaining that failure to timely object to magistrate judge's ruling "waives a party's right to review"). Johnson fails to respond to the government's waiver argument in his reply brief. Thus, he has "waive[d], as a practical matter anyway," any non-obvious reasons for rejecting it. *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994). Accordingly, even assuming that Johnson raised his email argument below, we would nevertheless decline to address it.

asserts that we must reverse those convictions because the district court erred in excluding evidence of the false statements' alleged immateriality.

Johnson concedes that materiality isn't an element of § 1014. But he cites *United States v. Phillips*, 731 F.3d 649, 652 (7th Cir. 2013), for the proposition that evidence of immateriality can nevertheless demonstrate that a defendant never intended for the false statement to influence a bank. *See* § 1014 (prohibiting making false statement "for the purpose of influencing" certain institutions). And he then cites various instances in which the district court refused to admit testimony or evidence that would have allegedly demonstrated the false statements' immateriality.

The problem is that Johnson doesn't assert or establish that he argued to the district court his theory that the testimony and evidence he sought to admit was relevant to prove immateriality. Nor does he assert or establish that he cited *Phillips*, 731 F.3d 649, or otherwise argued that evidence of immateriality was in any way relevant to prove that he lacked the requisite intent to influence. Thus, Johnson has once again failed to demonstrate that he advanced below the *specific* argument he now raises on appeal. *See Nelson*, 868 F.3d at 891 & n.4.

In fact, Johnson essentially concedes as much in his reply brief. There, he suggests he didn't have to raise this precise argument below because the evidence's "relevance to immateriality was evident on its face." Rep. Br. 20. But we know of no authority indicating that our plain-error test doesn't apply to forfeited arguments so long as those arguments are obvious or "evident," *id.*, and Johnson cites none. And in any case, the record citations that Johnson *does* provide in his opening brief suggest

29

that his materiality argument wasn't "evident," *id.*, to the district court: the court indicated that it thought Johnson was trying to elicit evidence of WFB's negligence, not the alleged immateriality of the false statements. Even if we assume this was a misapprehension, Johnson did nothing to correct it.

Moreover, Johnson makes no plain-error argument in his opening brief. In fact, Johnson doesn't even advance a plain-error argument in his reply brief—despite essentially conceding there that he forfeited this argument below. *Cf. United States v. Courtney*, 816 F.3d 681, 684 (10th Cir.) (reviewing for plain error where appellant "argued plain error fully in his reply brief"), *cert. denied*, 137 S. Ct. 238 (2016). Accordingly, we treat Johnson's immateriality argument as waived and decline to consider it. *See Richison*, 634 F.3d at 1131. And we likewise decline to address his related suggestion that the district court erred in failing to instruct the jury "that it could consider immateriality in assessing Johnson's intent." Aplt. Br. 46. Johnson neither demonstrates that he objected to the instruction on this specific basis below nor argues for plain error on appeal. *See Richison*, 634 F.3d at 1131.

### G.      Expert-Witness Testimony

Johnson next asserts that the district court erred in excluding the testimony of his expert witness, Gene Hoffman Jr. We review this argument for abuse of discretion. *See United States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012). "A district court abuses its discretion only if its ruling is 'arbitrary, capricious, whimsical[,] or manifestly unreasonable or when we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in

the circumstances.'" *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quoting *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 883 (10th Cir. 2005)). Nevertheless, despite this deferential standard of review, the Federal Rules of Evidence have a "liberal thrust," *Daubert v. Merrell Dow. Pharms., Inc.*, 509 U.S. 579, 588 (1993) (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)), and there is a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact," *United States v. Valasquez*, 64 F.3d 844, 849 (3d Cir. 1995) (quoting *DeLuca ex rel. DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990)).

Here, the district court excluded Hoffman's testimony after determining that he lacked the requisite "knowledge, skill, experience[,] or training." App. vol. 65, 17544; *see also* Fed. R. Evid. 702. The district court based that ruling on several factual findings, e.g., that Hoffman had only "infrequent[]" experience with "the underwriting and application processes," App. vol. 65, 17543–44; that his "involvement with the card payment system" was "relatively intermittent," *id.* at 17544; that his "experience" with "the relationships of acquiring banks, ISOs, and third-party processors and merchants" was "intermittent and limited," *id.* at 17545–46; and that he lacked "familiarity with the industry standards in the disclosure area," *id.* at 17546.

Johnson acknowledges some of these factual findings in his opening brief. But he makes no attempt to establish they are clearly erroneous. *See Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995). Nor does he directly engage with the district

31

court's conclusion that Hoffman was unqualified. True, he recites Hoffman's background and experience. And he lists the testimony Hoffman would have offered. But he fails to explain how the former rendered Hoffman qualified to offer the latter—especially in light of the district court's unchallenged factual findings.[14]

"The first task of an appellant is to explain to us why the district court's decision was wrong." *Nixon*, 784 F.3d at 1366. To accomplish that task, an appellant can't allow "the reasons that were given by the district court" for a particular ruling to "go unchallenged." *Id.* Instead, an appellant must "explain what was wrong with the reasoning that the district court relied on in reaching its decision." *Id.*

Johnson makes no effort to do that here. The district court excluded Hoffman's testimony because it found him unqualified. And Johnson fails to "explain what was wrong with th[at] reasoning." *Id.* Instead, as the government points out, Johnson appears to argue that the district court erred in excluding Hoffman's testimony because that testimony "would have supported [Johnson's] theory of the case." Aplee. Br. 122. But Johnson cites no authority suggesting that a witness can offer expert testimony simply because the testimony might "assist the defendants in presenting their theory of the case." Aplt. Br. 50. Rather, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The district court concluded that Hoffman wasn't so qualified. And

---

[14] Perhaps recognizing the problems inherent in this approach, Johnson argues in his reply brief that the district court's "characterization of Hoffman's experience as inadequate is belied by" the record. Rep. Br. 24. But arguments advanced for the first time in a reply brief are waived. *Beckstead*, 500 F.3d at 1163.

32

because Johnson fails to challenge the district court's reasoning on that point, he fails to demonstrate reversible error. *See Nixon*, 784 F.3d at 1366, 1369.

### H. Johnson's Confrontation Clause Argument

Johnson next alleges that the district court violated his rights under the Confrontation Clause by prohibiting him from cross-examining certain witnesses about topics the government allegedly opened the door to when it broached those topics on direct.

"[W]here a Confrontation Clause objection is not *explicitly* made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001) (alteration in original) (emphasis added) (quoting *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc)). Here, Johnson not only fails to assert or establish that he made an explicit Confrontation Clause argument below; he again concedes in his reply brief that he failed to do so. Moreover, Johnson doesn't argue for plain error in his reply brief, even after the government suggests in its response brief that he forfeited this argument below. Accordingly, we treat this argument as waived and decline to consider it. *See Richison*, 634 F.3d at 1131.[15]

---

[15] Perhaps we could read Johnson's opening brief as advancing an alternative argument on this point: that the district court instead made a mere evidentiary error in refusing to allow the defendants to explore certain topics on cross-examination. But even assuming Johnson has adequately briefed this alternative argument, we would reject it.

## I.     Johnson's Due Process Clause Arguments

We likewise treat as waived Johnson's arguments that the district court

violated his due-process rights by (1) suggesting, in the jury's presence, that Johnson

would ultimately appeal—a statement he says conveyed that the district court thought

the jury would convict him; (2) making objections on the government's behalf; and

(3) making comments that suggested hostility towards the defendants and defense

counsel.[16] Once again, Johnson fails to provide any record citations establishing that

he objected to the district court's actions or otherwise raised these arguments below.

---

Johnson suggests that the district court was required to allow him to cross-examine witnesses about any subject the government explored on direct examination because the government "open[ed] the door" to the admission of that evidence. Aplt. Br. 54. But "[w]hen a party opens the door to a topic, the admission of rebuttal evidence on that topic" merely "becomes permissible"; it doesn't become mandatory. *Tanberg v. Sholtis*, 401 F.3d 1151, 1166 (10th Cir. 2005); *see also id.* ("[T]he decision to admit or exclude rebuttal testimony remains within the trial court's sound discretion.").

Here, Johnson doesn't dispute that admission of the testimony he sought to elicit was "prohibited by" the district court's pretrial orders. Aplt. Br. 52. Nor does he dispute that he failed to object when the government successfully elicited similarly barred testimony on direct. And critically, he fails to challenge the district court's suggestion that the defendants were attempting to use the open-the-door doctrine to circumvent the court's pretrial orders by intentionally refusing to object to the government's questions. Under these circumstances, the district court didn't abuse its discretion in refusing to allow the defendants to "waive [themselves] into a position where" the court would admit evidence it had previously ruled was inadmissible. App. vol. 48, 12474.

[16] Johnson also makes a single passing reference to the district court's suggestion that certain evidence established an element of the government's case. But stray sentences like this one are insufficient to adequately present an argument on appeal. Accordingly, we don't address this statement. *See Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) ("[S]uch perfunctory complaints fail to frame and develop an issue sufficient to invoke appellate review.").

And he likewise fails to make a plain-error argument in his opening brief. Moreover, even though the government repeatedly asserts in its brief that plain-error review is appropriate, Johnson neither challenges these assertions nor makes any attempt to argue for plain error in his reply brief. *Cf. Courtney*, 816 F.3d at 684. Accordingly, we treat these Due Process Clause arguments as waived and decline to consider them.[17] *See Richison*, 634 F.3d at 1131.

## J.    Denial of Evidentiary Hearings

Johnson next argues that the district court erroneously denied him evidentiary hearings on certain matters. But Johnson's "[a]rgument" on this issue consists solely of a list of subjects upon which the district court allegedly failed to conduct hearings, followed by a single sentence: "Considering the severity of the charges and the importance of the issues raised, the lack of evidentiary hearings deprived Johnson of a fair trial and due process." Aplt. Br. 64–65. The deficiencies in this approach are manifest.

First, with the exception of his motion for new trial, Johnson doesn't even suggest—let alone provide citations establishing—that (1) he actually requested hearings on these matters and (2) the district court subsequently denied those

---

[17] Our independent review of the record indicates that Johnson raised these arguments in his motion for new trial. But even if Johnson asserted that this was sufficient to avoid plain-error review on appeal—and, to be clear, he does not—we would reject that assertion. *See United States v. Toro-Pelaez*, 107 F.3d 819, 828 (10th Cir. 1997) ("[Defendant] failed to contemporaneously object regarding the first of the two reasons he asserts as justification for a new trial. Thus, we are again constrained in our review of this asserted error, and may only reach the issue if we find plain error.").

requests. Second, even assuming that Johnson made (and the district court denied) such requests, we would review those denials only for abuse of discretion. *See United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999) ("[O]ur general rule [is] that decisions on the propriety of evidentiary hearings are reviewed for an abuse of discretion."). And a single sentence that nakedly cites "the severity of the charges and the importance of the issues raised," Aplt. Br. 65, is insufficient to demonstrate that the district court's failure to conduct evidentiary hearings on any of the matters listed was "arbitrary, capricious, whimsical, or manifestly unreasonable." *United States v. Lewis*, 594 F.3d 1270, 1277 (10th Cir. 2010) (quoting *United States v. Munoz-Nava*, 524 F.3d 1137, 1146 (10th Cir. 2008)). Accordingly, we find this argument waived and decline to address it. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson*, 500 F.3d at 1104.

## III. Challenges to Johnson's Sentence

In addition to the challenges he advances to his convictions—which we reject or decline to address for the reasons discussed above—Johnson also advances various challenges to his sentence.

### A. The Relevant Loss

First, Johnson alleges that the district court erred in determining the relevant loss for purposes of increasing his base offense level under U.S.S.G. § 2B1.1. In support, he advances four separate arguments: (1) the government waived any reliance on actual, as opposed to intended, loss to the banks; (2) the district court violated his Fifth and Sixth Amendment rights by relying on uncharged or acquitted

36

conduct; (3) the district court relied on unsupported and unwarranted factual assumptions; and (4) the district court failed to offset certain fees paid by IWorks. "We review the district court's loss[-]calculation methodology de novo and its factual finding of loss for clear error." *United States v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014).

### 1. Waiver

In asserting that the government waived any reliance on actual loss for sentencing purposes, Johnson relies on a single statement the government made at a July 7, 2015 hearing. There, the government stated, "There is no loss to the bank here, we concede that. But the way I read the case law is that we don't have to prove loss, we can prove intended loss."[18] App. vol. 40, 10392.

Citing this statement, Johnson argues the district court subsequently erred in relying on actual loss to the card-issuing banks for purposes of § 2B1.1. But Johnson makes no effort in his opening to brief to explain why we should conclude that, when the government stated there was "no loss to the bank," App. vol. 40, 10392, the government was referring to the multiple card-issuing banks, rather than solely to WFB. And in the absence of any reasoned argument to that effect, we decline to reach that conclusion. On the contrary, the government referred to a singular "bank,"

---

[18] At the outset, we note that Johnson doesn't provide a record citation establishing that he brought this specific statement to the district court's attention as part of his waiver argument. Moreover, he doesn't argue for plain error. Thus, we could treat this argument as waived and decline to consider it. But because the government doesn't ask us to do so, we proceed to the merits. *See Heckenliable*, 446 F.3d at 1049 n.3.

*id.*, rather than to multiple "banks" when it made the statement that Johnson relies on. Specifically, it stated, "There is no loss to *the bank* here." *Id.* (emphasis added). Thus, to the extent we interpret this statement as a concession at all, the government conceded only that there was "no loss to" WFB. *Id.* And this renders inapposite the authorities that Johnson cites.

For instance, the government's July 7, 2015 statement that there was no actual loss to WFB isn't "contrary" to the government's later position that *other* banks—i.e., the card-issuing banks—in fact suffered actual losses. *Steagald v. United States*, 451 U.S. 204, 209 (1981). Likewise, the government didn't "forsw[ear] reliance on" actual loss to those other banks by stating there was no loss to WFB. *United States v. Latimore*, No. 1:13-CR-287-TCB-AJB, 2014 U.S. Dist. LEXIS 91777, *20 n.17 (N.D. Ga. May 29, 2014). Nor did it explicitly "disclaim[]" reliance on actual loss to those banks. *United States v. Kutz*, Nos. CR-10-0217-F, CIV-15-1153-F, 2016 U.S. Dist. LEXIS 176894, *5–13 (W.D. Okla. May 5, 2016). Thus, the district court didn't abuse its discretion in rejecting Johnson's waiver argument.

Johnson also raises the specter that the government's statement about actual loss violated his due-process rights by (1) rendering involuntary his decision to go to trial rather than accepting a plea, and (2) punishing him for exercising his constitutional right to a jury trial. But he doesn't cite any authority to support either argument. Accordingly, we find them waived and decline to consider them. *See* Fed. R. App. P. 28(a)(8)(A); *Bronson*, 500 F.3d at 1104.

38

## 2.     Uncharged and Acquitted Conduct

Johnson next argues that the district court violated his Fifth and Sixth Amendment rights by considering "uncharged or acquitted conduct" at sentencing. Aplt. Br. 70. But "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997); *see also United States v. Lewis*, 594 F.3d 1270, 1289 (10th Cir. 2010) (noting that defendant's challenge to use at sentencing of "evidence of losses caused by conduct of which he had been acquitted" could "be disposed of summarily" under *Watts*). Absent en banc rehearing or an intervening Supreme Court opinion, we remain bound by our decision in *Lewis*.[19] *See United States v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014). We therefore reject this argument.

We likewise reject Johnson's cursory suggestion—which he addresses only in a footnote—that an as-applied challenge to the district court's use of uncharged conduct remains viable under *Watts*. Specifically, Johnson argues that "[i]f the use of acquitted or uncharged conduct produces a sentence that would be unreasonable in light of the actual offenses of conviction, such outcome violates the Sixth and Fifth Amendments." Aplt. Br. 71. But "the Courts of Appeals have uniformly taken [the Supreme Court's]

---

[19] In a letter of supplemental authority, *see* Fed. R. App. P. 28(j), Johnson suggests that *Nelson v. Colorado*, 137 S. Ct. 1249 (2017), constitutes such intervening authority. But *Nelson* doesn't even mention *Watts*. And the Supreme Court doesn't typically "overturn . . . earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). We see no reason to presume that it did so here.

39

continuing silence to suggest that the Constitution *does* permit otherwise unreasonable sentences supported by judicial factfinding, so long as they are within the statutory range." *Jones v. United States*, 135 S. Ct. 8, 9 (2014) (Scalia, J., dissenting from denial of cert.); *see also United States v. Redcorn*, 528 F.3d 727, 745 (10th Cir. 2008) (rejecting argument "that it is unconstitutional for the sentencing judge to rely upon a fact not found by the jury or admitted by the defendant in determining a sentence, where the sentence would not be reasonable in the absence of that fact"). Until the Supreme Court indicates we should do otherwise, we continue to adhere to this approach.

Alternatively, Johnson argues that even assuming the district court could rely on uncharged or acquitted conduct, it failed to make a finding that the conduct at issue caused the relevant harm. We again disagree. As the government points out, the district court expressly found that "the other merchant accounts gave rise to [the relevant] harm." App. vol. 38, 9900.

Johnson also suggests—although he doesn't explicitly state—that any finding of causation would be clearly erroneous because it would necessarily rely on the assumption that, for example, every merchant-account application contained false statements. But Johnson's three-sentence argument on this point overlooks a critical proposition: "[i]n calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's 'relevant conduct.'" *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009) (quoting U.S.S.G. § 1B1.3). And § 1B1.3 defines relevant conduct broadly: it includes not just the "criminal activity" itself, but "all acts and omissions" committed "within the

40

scope of the jointly undertaken criminal activity." § 1B1.3(a)(1)(B)(i). Because Johnson doesn't explain why only the merchant-account applications that contained false statements fall within this definition, we reject this argument.

### 3. Chargebacks

Johnson next argues that the district court erred in relying on unsupported factual assumptions to determine that each chargeback cost the card-issuing bank $25. Specifically, he asserts that this finding depends on the assumption that "each chargeback was by a different customer for a different card," and ignores the possibility that some of the chargebacks were associated with one customer and one card. Aplt. Br. 74. Johnson suggests that where one customer initiated multiple chargebacks on one card, the overhead cost to the card-issuing bank was less than $25 per chargeback because the $25 amount includes the cost of issuing a new credit card, and a single customer would only need one new card. Relatedly, Johnson asserts that the district court wrongly assumed that every customer who initiated a chargeback also canceled his or her card and received a reissued one.

Johnson's arguments aren't without intuitive appeal. But the district court heard testimony indicating that (1) each chargeback costs the card-issuing bank between $25 and $35; and (2) this amount arises not only from the cost of reissuing the cards, but also from the cost of staffing a call center that processes the chargebacks and provides customer service. Thus, by choosing an amount at the low end of this range, the district court made a "reasonable estimate of the loss" caused by each chargeback: while some chargebacks may have cost less than $25, some apparently cost more. *United States v.*

41

*Mullins*, 613 F.3d 1273, 1292 (10th Cir. 2010) (noting that "district court 'need only make a reasonable estimate of the loss,' not make a perfect accounting" (quoting § 2B1.1(b)(1), cmt. n.2(C)); *see also id.* (explaining that district court's factual finding of loss isn't clearly erroneous simply because it's "possibly or even probably wrong; the error must be pellucid to any objective observer" (quoting *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007)))).

Affording the district court "'appropriate deference,' in recognition of [its] 'unique position to assess the evidence and estimate the loss based upon that evidence,'" we conclude the district court didn't err in calculating the cost of each chargeback. *Id.* (quoting § 2B1.1(b)(1), cmt. n.2(C)).

### 4. Fines and Fees

Johnson next complains that the district court erroneously failed to deduct from its loss calculation certain fines and fees that IWorks allegedly paid to the card-issuing banks. But Johnson fails to identify in his opening brief where he raised below the fact-based arguments he now advances on appeal. And as the government points out, "failure to assert a factual dispute at sentencing waives the challenge because it prevent[s] . . . the district court from resolving the fact issue." *United States v. Wright*, 848 F.3d 1274, 1285 (10th Cir.) (second alteration in original) (quoting *United States v. Shengyang Zhou*, 717 F.3d 1139, 1154 (10th Cir. 2013)), *cert. denied*, 138 S. Ct. 115 (2017).

In response, Johnson asserts for the first time in his reply brief that he lacked an adequate opportunity to object to the district court's factual findings. There, he argues that (1) the district court required the parties to submit any sentencing memoranda by

July 22, 2016; (2) the district court didn't issue its preliminary loss ruling until July 28, 2016; and (3) by then, "Johnson was prohibited from submitting evidence to dispute the court's loss determination." Rep. Br. 35.

We could decline to address Johnson's late-blooming preservation argument. *See Beckstead*, 500 F.3d at 1163 (explaining that arguments advanced for the first time in a reply brief are waived). Johnson was required to provide, in his opening brief, a "precise reference in the record where [each] issue was raised and ruled on." 10th Cir. R. 28.2(C)(2). If Johnson thought good cause existed for us to overlook his inability to comply with that requirement, he should have stated as much in his opening brief and provided there a reasoned basis for that assertion. His failure to do so highlights the very reason we treat such arguments as waived: when an appellant raises an argument for the first time in a reply brief, "[i]t robs the appellee of the opportunity to demonstrate that the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result." *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000).

Here, the government had no opportunity to respond to Johnson's belated preservation argument. And for reasons the government likely would have pointed out if it had been afforded such an opportunity, Johnson's preservation argument fails on its merits. The district court conducted a sentencing hearing on July 29, 2016. At that hearing, Johnson had an opportunity to challenge the district court's preliminary loss calculation. In fact, he *did* challenge it, albeit on grounds he doesn't pursue on appeal. Moreover, although Johnson may have lacked the ability to present additional evidence at

43

that point, he doesn't identify what additional evidence he might have presented to support the arguments he now advances. And indeed, as we read Johnson's opening brief, his arguments rely on evidence that was already before the district court. Accordingly, we see no reason Johnson couldn't raise at the sentencing hearing the same fact-based challenges he now raises on appeal. Because his failure to do so "prevented . . . the district court from resolving" those issues, Johnson has waived any argument that the district court failed to offset certain fees and fines. *Wright*, 848 F.3d at 1285 (alteration in original) (quoting *Shengyang Zhou*, 717 F.3d at 1154).

### B.      Sophisticated Means

Johnson next asserts that the district court erred in imposing a "sophisticated[-] means" enhancement under § 2B1.1(b)(10)(C). Section 2B1.1(b)(10)(C) provides for a two-level increase if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The term "sophisticated means" encompasses "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." § 2B1.1 cmt. n.9(B). "For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means," as does "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*

In imposing the enhancement, the district court reasoned that "something as simple as [a] multi-state location may constitute 'sophisticated means.'" App. vol.

44

38, 9885 (quoting § 2B1.1(b)(10)(C)). And it pointed, as an example, to evidence that one of the underlying merchant-account applications in this case "show[ed] a Nevada corporation with a business address in Las Vegas, Nevada; the nominee owner's address in Alpine, Utah; and a bank account in St. George, Utah." *Id.* The district court also noted the complexity of the system the defendants employed to avoid detection and the high level of planning and coordination their scheme required:

> Establishment of each merchant account required a nominee owner, a corporate entity, an out-of-state address using a maildrop service, an agreement to forward mail from the fictitious addresses to [I]Works' address in St. George, out-of-state telephone service with a prefix number corresponding to the state of incorporation, designation of employee population on the applications, a depository bank account in the nominee's name with Scott Leavitt's signatory authority to enable fund transfer, transfer of funds from the nominee depository accounts directly to [I]Works and Johnson bank accounts, a tax identification number, and tax returns in the name of the nominee owners and corporations.

*Id.* at 9886.

Johnson doesn't appear to dispute that the scheme as a whole involved sophisticated means. Instead, he argues that "[t]he 'offense' here" wasn't the scheme as a whole, but rather the unsophisticated act of "writing incorrect information on a merchant account application." Aplt. Br. 80 (quoting § 2B1.1(b)(10)(C)).

But the Guidelines don't "require every step of the defendant's scheme to be particularly sophisticated; rather, . . . the enhancement applies when the execution or concealment of a scheme, *viewed as a whole*, is 'especially complex or especially intricate.'" *United States v. Weiss*, 630 F.3d 1263, 1279 (10th Cir. 2010) (emphasis added) (quoting § 2B1.1 cmt. n.9(B)); *see also United States v. Jenkins-Watts*, 574

45

F.3d 950, 962 (8th Cir. 2009) ("Even if any single step is not complicated, repetitive and coordinated conduct can amount to a sophisticated scheme." (quoting *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006))). Thus, the district court didn't err in failing to confine its analysis to the act of "writing incorrect information on a merchant account application," as Johnson asserts. Aplt. Br. 80.

And nothing in *United States v. Rice*, 52 F.3d 843 (10th Cir. 1995), suggests otherwise. There, we held that U.S.S.G. § 2T1.3(b)(2) (1989)'s sophisticated-means enhancement didn't apply to a defendant who "merely claimed to have paid withholding taxes he did not pay." *Rice*, 52 F.3d at 849. But even assuming that Johnson's conduct here was similar to the defendant's conduct in that case, the applicable Guidelines commentary in *Rice* clarified that the sophisticated-means enhancement at issue there only applied to conduct that was "more complex or demonstrate[d] greater intricacy or planning than a routine tax-evasion case." *Id.* at 849 (quoting § 2T1.3 (1989) cmt. n.2). Because the commentary to § 2B1.1(b)(10)(C) contains no similarly restrictive language, Johnson's reliance on *Rice* is misplaced. Accordingly, the district court didn't err in imposing the sophisticated-means enhancement.

## C. Gross Receipts

Johnson also challenges the district court's decision to impose a two-level enhancement under § 2B1.1(b)(16)(A). That enhancement applies if a "defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." § 2B1.1(b)(16)(A). Likewise, the relevant

46

commentary defines "gross receipts" to include property "obtained directly or indirectly as a result of such offense." § 2B1.1(b)(16)(A) cmt. n.12(B).

Citing this language, Johnson argues there's no evidence that he received more than $1 million "as a result of his actual offenses"—that is, as a result of the false statements on the account applications. Aplt. Br. 83. In support, he points out that the government failed to demonstrate WFB ever received the false statements, let alone relied on them in releasing any funds. The government doesn't disagree with this assertion. But in a one-paragraph argument, it nevertheless asks us to affirm the enhancement, arguing that (1) the false statements appeared on applications; (2) without those applications, the merchants wouldn't have received accounts; (3) without accounts, the merchants couldn't process credit-card payments; and (4) if the merchants couldn't process credit-card payments, then Johnson wouldn't have received the funds.

We think the government's argument reads § 2B1.1(b)(16)(A) too broadly. Instead, we agree with the Fifth Circuit: § 2B1.1(b)(16)(A)'s "simple language requires that the money be derived as a result of the violation of the statute." *See United States v. Sandlin*, 589 F.3d 749, 757 (5th Cir. 2009). And in the context of § 1014, that means the enhancement applies only if WFB released the funds "because of [Johnson's] false statements." *Id.* Here, the government doesn't dispute that it failed to present any evidence that would indicate WFB received or relied on Johnson's false statements. Accordingly, the district court erred in assessing a two-

47

level enhancement under § 2B1.1(b)(16)(A), and therefore we reverse Johnson's sentence and remand for resentencing.[20]

## IV.    The Government's Motion to Seal

As a final matter, we grant the government's motion to maintain Volumes 36 and 37 of its Supplemental Appendix under seal. And we also grant its motion to strike Volumes 76 and 77 of Johnson's Appendix; Johnson doesn't dispute the government's assertion that these volumes comprise documents that aren't part of the district-court record. *See* Fed. R. App. P. 10(a) (explaining that only certain items—including "original papers and exhibits filed in the district court"—"constitute the record on appeal"); *United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court."). Because we grant the government's motion to strike Volumes 76 and 77 of Johnson's Appendix, we deny as moot Johnson's motion to seal those volumes.

---

[20] Because the government failed to demonstrate that Johnson "obtained" more than $1 million "directly or indirectly *as a result of* [his] offense[s]," § 2B1.1(b)(16)(A) cmt. n.12(B) (emphasis added), we need not address whether the gross receipts were "derived . . . from one or more financial institutions," § 2B1.1(b)(16)(A). *Compare United States v. Huggins*, 844 F.3d 118, 122–23, 123 n.6 (2d Cir. 2016) ("Applying the enhancement to all cases where a defendant merely withdraws money from his own bank account at a financial institution cuts too broadly and is inconsistent with the primary purpose of the enhancement . . . ."), *with United States v. Stinson*, 734 F.3d 180, 186 (3d Cir. 2013) ("The word 'derived' directs us to determine the source of the funds. . . . [A] financial institution is a source of the gross receipts when it exercises dominion and control over the funds and has unrestrained discretion to alienate the funds.").

## Conclusion

For the reasons discussed above, we affirm Johnson's convictions. But because the district court erred in assessing a two-level enhancement under § 2B1.1(b)(16)(A), we reverse his sentence and remand for resentencing.

Entered for the Court

Nancy L. Moritz
Circuit Judge